**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Maner,<br><br>          Plaintiff,<br><br>v.<br><br>Dignity Health, f/k/a Catholic Healthcare West,<br><br>          Defendant. | No. CV16-3651-PHX DGC<br><br>**ORDER** |

Plaintiff William Maner filed a complaint against Defendant Dignity Health for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. Docs. 1, 30. Dignity Health moves for summary judgment on all claims. Doc. 80. The parties also jointly move to file documents under seal. Doc. 84. The motions are fully briefed, and no party requests oral argument. Docs. 80-83, 86, 87. For the reasons that follow, the Court will grant both motions.

**I.    Background.**

The following facts are undisputed unless otherwise noted.[1] From 1999 until 2008, Maner worked for Dr. Robert Garfield at the University of Texas Medical Branch in Galveston, Texas. Doc. 83-1 at 52-53. In 2008, Garfield moved his research to Dignity Health in Phoenix, Arizona, and invited Maner to join his team there. Doc. 83-1

---

[1] Citations are to page numbers attached to the top of pages by the Court's ECF system, not to original numbers on the document pages.

at 53-54. Maner agreed, and Dignity Health hired Maner as a Bio Med Design Engineer in its Research Grants Department, where Garfield remained Maner's supervisor. Doc. 83-1 at 53; Doc. 81-1 at 52. Garfield also invited researchers Leili Shi and Dr. Yuan L. Dong to continue working with him in Phoenix. Doc. 83-1 at 54. Shi and Garfield had been in a romantic relationship for about 22 years (Doc. 81-2 at 4), and Maner was aware of their relationship (Doc. 83-1 at 55).

Due to space constraints in Garfield's Phoenix lab, Maner worked at Dignity Health's facility several miles away with two other researchers. Doc. 83-1 at 59-60, 64. Maner's job duties included providing "technical biomedical engineering support . . . in the design and applications of" equipment, monitoring research subjects, working with Garfield on "design and experimental protocols," and "[i]nteract[ing] with clinical colleagues, postdoctoral fellows, students and other faculty." Doc. 81-1 at 55. Maner agrees his job duties included interactions with others, but disputes he was required to be "at the hospital" for those interactions and states that he "regularly interacted with colleagues remotely." Doc. 83 ¶ 4.

Between July 2008 and July 2009, Garfield rated Maner's performance at Dignity Health as "outstanding" and gave him the highest rank in every category. Docs. 83-1 at 76-77, 79; 81-1 at 56-68. Garfield's comments included:

> Overall an outstanding performance. It would be very difficult to function at our present level without Mr. Maner. He does an excellent job in assisting in all aspects of our work . . . . He gets along very well with everyone and strives to achieve the highest levels of accomplishments.

Doc. 81-1 at 68.

Maner received a salary increase based on Garfield's July 2009 review (*id.* at 20, 71), and a further increase in September 2010 after another favorable review (*id.* at 73-78, 80). In August 2010, a Texas court put Maner on probation. Doc. 83-1 at 93-94. Maner learned he would need to serve his probation in Texas unless he received permission to work outside the state. *Id.* at 95-96. Maner asked Garfield if he could

work remotely in Texas. Docs. 83-1 at 92; 81-1 at 82. Garfield agreed, saying: "I will help you any way I can. We will work this out even if you have to stay in Galveston for some time." Docs. 83-1 at 96; 81-1 at 82.

Maner admits he was an at-will employee at Dignity Health and that Garfield could have terminated him rather than permit remote work. Doc. 83-1 at 97. But Maner disputes that "working physically (as opposed to remotely) in Garfield's lab was a condition of his employment." Docs. 83 ¶ 25; 83-1 at 96-97. Maner could have sought permission from the Texas probation department to work in Phoenix and commute to Texas to report to his probation officer (Doc. 83-1 at 93), but he did not make the request because it was "absolutely impractical" financially and temporally (*id.* at 92, 95).

Maner began working in Texas in late 2010. Doc. 83-1 at 128-29. In August 2011, Garfield gave him an unfavorable review, stating that he "Needs Improvement" in almost every review category. Doc. 81-1 at 86-90. Garfield's comments included:

> [Maner] has helped occasionally on analysis of data but it is essential that he be here to fulfill all our needs and it [is] obvious that this can not be done completely when he is in Texas. Doc. 81-1 at 86.

> Little in the way of support. . . . Little to help our goals and studies. . . . Little help as interface. . . . Has not been here to help with staff members. He has on occasion communicated with others on the phone but he is required to be here to participate. *Id.* at 87.

> Effectively has not [per]formed as expected because he is located in Texas and it is not always possible to contact him. *Id.* at 88.

Garfield concluded: "[i]t is not possible [for Maner] to fulfill the needs of this position from Texas and under conditions which we have no control." *Id.* at 90. Garfield recommended that Maner return to Phoenix immediately or be terminated. *Id.* at 90.

Maner contested Garfield's review in a letter to Dignity Health which will be referred to in this order as the "Review Response." Doc. 81-1 at 84. Maner listed several projects he worked on in Texas, asserted that he had frequent and documented contact with colleagues, and stated that he was informed on multiple occasions that his work was

successful. *Id.* As evidence that Garfield was happy with his work, Maner pointed to an email shortly before the review in which Garfield wrote that the lab was running out of funds and needed to develop a strategy to pay Maner. Doc. 83-8 at 4; Doc. 83 ¶¶ 82-85. The Review Response asserted that limited funding, not Maner's performance, prompted the "inaccurate" review. Doc. 83-1 at 144.

Maner also wrote a letter to a Dignity Health doctor (the "Lukas letter"), regarding his arrangement to work in Texas, his performance, and funding for his position. Doc. 81-1 at 93. In a letter to Dignity Health Senior Vice President on October 11, 2011 ("the Vallier letter"), Maner addressed his work performance and the availability of funds for his position. *Id.* at 96.

Dignity Health claims to have terminated Maner on October 1, 2011. Doc. 81-3 at 5, 11. Maner disputes this date, arguing that he continued to work for Dignity Health through November 2011, expecting compensation. Docs. 83 ¶ 94-95; 83-1 at 178-79; 83-2 at 28-38. Garfield terminated another male in his lab – Dr. Dong – in 2010. Doc. 83-1 at 234-37.

**II.     Summary Judgment Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such

1 that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III. Discussion.**

Maner alleges two Title VII claims: sex discrimination and retaliation. Doc. 30. Dignity Health moves for summary judgment on both claims. Doc. 80.

**A. Sex Discrimination.**

An employer violates Title VII when it subjects an employee to disparate treatment because of the employee's sex. 42 U.S.C. § 2000e-2(a); *see Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690 (9th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). A plaintiff can establish an inference of discrimination "by satisfying the prima facie elements from *McDonnell Douglas*: (1) the plaintiff belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at 690-91.

Once a plaintiff satisfies this prima facie case, "the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. If the defendant meets this burden, then the plaintiff must . . . raise a triable issue of material fact as to whether the defendant's proffered reasons are mere pretext for unlawful discrimination." *Id.* at 690-91 (internal quotations and citations omitted). Alternatively, "a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." *Id.* (internal quotations omitted).

Dignity Health argues that Maner fails to complain of sex discrimination under Title VII because he alleges only that Garfield favored Shi because of their romantic relationship, not because of discrimination against males. Doc. 80 at 5. Even if he does allege sex discrimination, Dignity Health argues that Maner cannot satisfy the fourth

element of his prima facie case – that similarly situated employees were treated more favorably. *Id.* at 8.

### 1. Maner's Sex Discrimination Claim.

Maner argues that Dignity Health mischaracterizes his claim, but Maner's own statements repeatedly show that his claim of disparate treatment is based not on the fact that he is male, but on Garfield's favoritism of a romantic partner. Maner complains that he was "treated less favorably than Shi because Garfield preferred his female employee and romantic live-in partner for the purposes of travelling to conferences." Doc. 30 ¶ 34. Maner claims he was terminated because Garfield "needed to terminate another male employee in order to free up the funds to keep his girlfriend employed." Doc. 83-1 at 142. Maner asserts: "She's a female. He's terminating a male to keep her employed. Of course it's sex discrimination." Doc. 83-1 at 146. And: "If I were a woman that was sleeping with him, I would have probably got a glowing review in 2011." Doc. 83-1 at 161. Maner responded similarly throughout his deposition. *See* Doc. 83-1 at 163-68.

Maner's response to the motion for summary judgment makes the same argument: Garfield "unlawfully favored his romantic partner Leili Shi (female) over the course of several years, and protected her from termination on two separate instances." Doc. 82 at 1-2. Garfield "gave work preferences to his female partner, Leili Shi, as compared to the male workers," and showed "continued, unwavering, favoritism towards his female romantic partner." *Id*. at 8-9. In short, Maner's claim rests on Garfield's favoritism of Shi because of their romantic relationship.

### 2. The "Paramour Theory."

Maner asserts a Title VII claim that has been called the "paramour theory." This name describes "claims of discrimination where a supervisor's preference for a paramour . . . results in an adverse employment action against the plaintiff." *Nygren v. AT & T Wireless Servs., Inc.*, No. C03-3928JLR, 2005 WL 1152281, at *3 (W.D. Wash. 2005). The Equal Employment Opportunity Commission ("EEOC") has provided guidance on the paramour theory:

> Title VII does not prohibit . . . preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a 'paramour' . . . may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.

EEOC Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism, EEOC Notice No. N–915–048 (Jan. 12, 1990).

Courts have adopted the same view. The Second Circuit's decision in *DeCintio v. Westchester Cty. Med. Ctr.*, 807 F.2d 304 (2d Cir. 1986), is illustrative. Seven male respiratory therapists alleged sex discrimination after a supervisor selected a female respiratory therapist – his romantic partner – for promotion. *Id.* at 305-06. The plaintiffs alleged that the promotion opportunity had been written with a particular registration requirement that only the female could satisfy. *Id.* at 306. The Second Circuit concluded, however, that to expand the meaning of "sex" under Title VII "to include 'sexual liaisons' and 'sexual attractions'" would be "wholly unwarranted" because the male plaintiffs did not suffer disparate treatment due to their sex. *Id.* at 306, 308. They were discriminated against because their supervisor favored his paramour, "exactly the same predicament as that faced by any woman applicant for the promotion." *Id.* at 308.

At least seven other circuits have also rejected the paramour theory. *See Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 909-10 (8th Cir. 2006) (sexual favoritism "does not amount to discrimination on the basis of the employee's status as a man or woman" under Title VII); *Ackel v. Nat'l Comms.*, Inc., 339 F.3d 376, 382 (5th Cir. 2003) (where "an employer discriminates in favor of a paramour, such an action is not sex-based discrimination, as the favoritism, while unfair, disadvantages both sexes alike for reasons other than gender") (citation omitted); *Schobert v. Ill. Dept. of Transp.*, 304 F.3d 725, 732-33 (7th Cir. 2002) (finding that "Title VII does not [] prevent employers from favoring employees because of personal relationships" because, "[h]ad there been other women in the [shop], they would have suffered in exactly the same way [as the male plaintiff], which also shows why this is not really a sex discrimination problem");

*Womack v. Runyon*, 147 F.3d 1298, 1300-01 (11th Cir. 1998) (affirming dismissal of sex discrimination claim based on favoritism of a paramour for a promotion); *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) (holding that plaintiffs did not state a claim for sex discrimination by alleging that "supervisor preselected his paramour for a [benefit] even though she was less qualified than either [p]laintiff. . . . because they are based on a voluntary romantic affiliation, and not on any gender differences"); *Becerra v. Dalton*, 94 F.3d 145, 149-50 (4th Cir. 1996) (no Title VII sex discrimination when supervisor extended promotion to plaintiff's coworker in exchange for sexual favors from coworker), *cert. denied*, 519 U.S. 1151 (1997); *Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 501 (W.D. Pa. 1988) ("[P]referential treatment on the basis of a consensual romantic relationship between a supervisor and an employee is not gender-based discrimination."), *aff'd mem.*, 856 F.2d 184 (3d Cir. 1988).

The Ninth Circuit has not adopted the paramour theory as a viable claim under Title VII. *Candelore v. Clark Cty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992); *id.* at 591-92 (Kleinfeld, J., concurring) ("Our decision should not be read as . . . establishing any doctrine on whether discrimination on account of a coworker's consensual romantic relationship with a supervisor violates Title VII, because we have not reached the legal issue."); *see also Knadler v. Furth*, 253 Fed. Appx. 661, 664 (9th Cir. 2007) ("We have not accepted the 'paramour' theory of gender discrimination."). District courts in this circuit generally reject the paramour theory. *See Alberto v. Bank of Am.*, No. C–94–1283–VRW, 1995 WL 562170 at *5 (N.D. Cal. Sept. 13, 1995) (rejecting theory and adopting the reasoning of the Second Circuit in *DeCintio*); *cf. Nygren v. AT & T Wireless Servs., Inc.*, No. C03-3928JLR, 2005 WL 1152281, at *3 (W.D. Wash. April 21, 2005) (looking to Title VII case law to interpret Washington anti-discrimination law and agreeing with circuits that have dismissed the paramour theory as basis for sex discrimination); *Keenan v. Allan*, 889 F. Supp. 1320, 1375 n.66 (E.D. Wa. 1995) ("Preferential treatment on the basis of a consensual relationship between a supervisor and an employee does not constitute a cognizable sex discrimination claim under Title

VII for other employees.") (citing cases and EEOC Policy Guidance), *aff'd*, 91 F.3d 1275 (9th Cir. 1996). *But see, e.g., Olvera v. Sierra Nev. College*, No. 3:08–cv–00355–LRH–VPC, 2010 WL 185950, at *4 (D. Nev. Jan. 15, 2010) (reading *Candelore* as stating a test under the paramour theory); *Perron v. Sec., Dept. of Health & Human Servs.*, No. 2:06-cv-02429-MCE-GGH, 2007 WL 4219171, at *6 (E.D. Cal. Nov. 29, 2007) (same).

The Court agrees with *DeCintio*'s reasoning and the vast majority of courts. "'Sex' in Title VII should be read to refer only to discrimination based on gender, not discrimination based on sexual activity regardless of gender." *Alberto*, 1995 WL 562170, at *5. "[A] consensual sexual relationship between a supervisor and an employee does not give other employees a Title VII cause of action, because such a relationship prejudices male and female employees equally." *Id.* Thus, Maner's claim of sex discrimination, based on Garfield's alleged favoritism of Shi as a paramour, fails as a matter of law.

The cases cited by Maner are unavailing. *See King v. Palmer*, 778 F.2d 878, 880 (D.C. Cir. 1985) (not addressing whether Title VII prohibits paramour favoritism); *id.* at 883 (per curiam) ("Rehearing of the issue en banc would be inappropriate because no party challenged that application of Title VII on appeal, and the issue was not briefed or argued to the panel."); *see also Broderick v. Ruder*, 685 F. Supp. 1269, 1277 (D.C. Cir. 1988) (citing *King* for undecided proposition); *Toscano v. Nimmo*, 570 F. Supp. 1197, 1198-1201 (D. Del. 1983) (discussing court's factual findings and not addressing paramour theory); *Priest v. Rotary*, 634 F. Supp. 571, 581-82 (N.D. Cal. 1986) (discussing sexual harassment and hostile work environment claims).

Maner asserts no basis for sex discrimination aside from Garfield's alleged favoritism of Shi. *See* Doc. 82 at 8-16. Maner's conclusory assertions about Garfield's anti-male prejudice are insufficient to create a triable issue. *See Anderson*, 477 U.S. at 249-52. Maner points to no evidence – other than Garfield's relationship with Shi – for his claim that Garfield preferred females to males.

Finally, Maner cites 29 C.F.R. § 1604.11 as support for his theory (Doc. 82 at 11), but that regulation pertains to sexual harassment which Maner does not allege in his complaint. Summary judgment "is not a procedural second chance to flesh out inadequate pleadings." *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

The Court will grant Dignity Health's summary judgment motion on Maner's sex discrimination claim. *See* Doc. 80 at 8-11.

**B.     Retaliation.**

Title VII prohibits retaliation against an employee for opposing an unlawful employment practice or participating in a Title VII proceeding. 42 U.S.C. § 2000e-3(a). A successful retaliation claim must establish that (1) the employee engaged in a protected activity, (2) the employer took an adverse employment action against the employee, and (3) the employer would not have taken the adverse employment action but for a design to retaliate. *Nilsson v. City of Mesa*, 503 F.3d 947, 953-54 (9th Cir. 2007); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (clarifying that employee must show "but for" causation). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for its actions." *Nilsson*, 503 F.3d at 954 (internal quotations omitted). If the defendant does so, the plaintiff must show the articulated reason is a mere pretext. *Id.* Dignity Health argues Maner cannot show that he engaged in protected activity. Doc. 80 at 12.[2]

**1.     Protected Activity.**

An employee engages in protected activity for purposes of Title VII when he opposes conduct that he reasonably believes to be an unlawful employment practice, or when he participates in an EEOC investigation or proceeding. 42 U.S.C. § 2000e-3(a); *see Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). Maner does not

---

[2] Dignity also argues that Maner cannot show "but for" causation, but the Court need not address this issue. Doc. 80 at 12.

- 10 -

claim to have participated in any EEOC investigation or proceeding, so his claim is based entirely on his alleged opposition to an unlawful employment practice.

"An employee need not utter magic words to put his employer on notice that he is complaining about unlawful discrimination." *Ekweani v. Ameriprise Fin., Inc.*, No. CV-08-01101-PHX-FJM, 2010 WL 481647, at \*6 (D. Ariz. Feb. 8, 2010) (citation omitted). Whether "analyzed as a requirement for protected activity or under the element of causal link, . . . an employer must reasonably be aware that its employee is engaging in protected activity." *Id.* (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)); *see also Quinones v. Potter*, 661 F. Supp. 2d 1105, 1126-27 (D. Ariz. 2009) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291-92 (2d Cir. 1998) for the proposition that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII").

The first question is whether Maner ever clearly opposed an unlawful employment practice. Maner points to the Vallier letter, the Lukas letter, and the Review Response as his protected activity. Doc. 83 ¶¶ 47-48. Maner concedes that the Lukas letter does not mention Shi, and the parties dispute whether it concerns allegations of discrimination. Docs. 81 ¶ 50; 83 ¶ 50. The parties also dispute whether the Vallier letter alleges discrimination. Docs. 81 ¶¶ 51-53; 83 ¶¶ 51-53.

The Review Response does not mention discrimination. Maner asserts that the following passage complains of sex discrimination because it "necessarily means [Shi] gets to keep the funds to support her" position and "implie[s] that funding would be used to fund someone" other than him. Doc. 83-1 at 145-46.

> Recent claims from [Dignity Health] of limited funding available to support William Maner's position have now apparently prompted a sudden, inaccurate, and unfairly negative employee evaluation on the part of [Dignity Health], possibly in an effort to remove William from the payroll.

1 | Doc. 83-1 at 144.

The Court will not infer meaning beyond Maner's chosen words. Maner's only stated purpose in the letter was to "[a]ppeal[] the unfair Employee Evaluation, as well as the equally unfair proposal to terminate William Maner['s] employment, based either upon work performance or funding issues, or both." Doc. 81-1 at 85. The Review Response addresses the recent unfavorable performance review and concerns about funding. It says nothing about sex discrimination.

Nor does the Lukas letter address allegations of discrimination or unfair treatment. It concerns only Maner's performance and funding for his position. *See* Doc. 81-1 at 92-94.

The Vallier letter does contains statements that a jury might reasonably view as protected activity: (1) "said funds are now being appropriated in a nepotistic manner by [Dignity Health] management that also violates EEOC articles"; and (2) "[f]or [Dignity Health] to proceed with my termination . . . would constitute unfair labor practices which would violate [Dignity Health] internal written employment policies, as well as EEOC articles, and are therefore illegal under Arizona and California labor law, even for "at-will" employers." Doc. 81-1 at 96. Because the parties dispute the meaning and significance of the Vallier letter, the Court cannot grant summary judgment on the ground that Maner never opposed an unlawful employment practice.

### 2. Underlying Title VII Claim.

In a separate argument, Dignity Health asserts Maner cannot establish protected activity because the conduct Maner complained about – Garfield's favoritism of Shi – is not prohibited by Title VII as sex discrimination. Doc. 80 at 13-14. This argument requires the Court to review Ninth Circuit cases on when an employee's complaint is sufficient to support a retaliation claims.

In *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978), the City of Los Angeles terminated Sias because he wrote a grievance letter to the Department of Housing and Urban Development detailing his concerns about insufficient minority

representation in his city agency. *Sias*, 588 F.2d at 693-94. The City argued on appeal that Sias could not assert a retaliation claim because the trial court made no finding of actual Title VII discrimination. *Id.* at 694. The Ninth Circuit disagreed. It noted that the trial court had in fact found Sias's "discharge to have racial implications because Sias complained of discrimination against him and other Mexican-Americans in employment and promotion," and held that because his "opposition was based on a reasonable belief" that unlawful discrimination had occurred, Sias engaged in protected activity and could assert a claim for retaliation. *Id.* at 695-96. Other Ninth Circuit cases have confirmed that a "reasonable belief" that the complained-of conduct violates Title VII will support a retaliation claim. *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir. 1987) ("opposition based on a reasonable belief that the order is discriminatory is protected."); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (same).

In *Learned*, the plaintiff sued the City of Bellevue under an insurance statute for a prior workplace injury. *Learned*, 860 F.2d at 930. After filing suit, Learned was harassed at work and filed three complaints with the state's human rights commission over the course of a year, the first alleging discrimination based on physical and mental limitations and the second and third alleging retaliatory conduct. *Id.* at 932. In his first complaint, Learned also checked a box alleging a violation of Title VII. *Id.* The Ninth Circuit affirmed the dismissal of Learned's retaliation claim because he had never alleged "that he ever opposed any discrimination [under Title VII]." *Id.* The court stated that employees charging retaliation under section 2000e-3(a) need not prove that the opposed conduct actually violates Title VII, but "the opposed conduct *must fairly fall within the protection of Title VII* to sustain" the claim. *Id.* (emphasis added). Because Learned opposed "what he believed was discrimination based upon physical and mental limitations only," he could not have reasonably believed the City violated Title VII on that basis. *Id.* As a result, his retaliation claim failed.

In *Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th Cir. 1994), the Ninth Circuit seemed to depart from *Learned* when it explained that "[a]n erroneous belief that an employer

- 13 -

engaged in an unlawful employment practice is reasonable, and thus actionable under § 704(a), if premised on a mistake made in good faith. A good-faith mistake may be one of fact or of law." *Id*. at 1385. In *Moyo*, a prison guard alleged he was fired for refusing to discriminate against black inmates. *Id.* At issue was whether inmates were "employees" under Title VII. *Id.* The Ninth Circuit reversed dismissal of the retaliation claim for three alternative reasons. *Id.* at 1385-86. First, Moyo may have been able to plead his claim so as not to raise the question of whether inmates were employees. *Id.* at 1385. Second, Moyo may have been able to prove that inmates were employees. *Id.* And third, even if the inmates were not employees, Moyo still would have "be[en] able to state a retaliation claim if he could show that his belief that an unlawful employment practice occurred . . . was otherwise 'reasonable.' The reasonableness of Moyo's belief that an unlawful employment practice occurred [was to] be assessed according to an objective standard – one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." *Id.* at 1385-86.

The Court finds *Learned* and *Moyo* to be inconsistent. Under *Learned*, complaints about conduct are not protected for purposes of a retaliation claim unless the conduct "fairly fall[s] within the protection of Title VII." *Learned*, 860 F.2d at 932. Under *Moyo*, the conduct need not "fairly fall" within Title VII. It can fall outside Title VII so long as the plaintiff had limited knowledge and simply made a mistake of law. *Moyo*, 32 F.3d at 1385.

For three reasons, the Court concludes that it should follow *Learned* rather than *Moyo*. First, the Ninth Circuit has instructed that the earlier case (*Learned*) controls over the later inconsistent case (*Moyo*) because the panel that decided the later case had no authority to overrule Ninth Circuit precedent. *Koerner v. Grigas*, 328 F.3d 1039, 1050 (9th Cir. 2003) ("We begin by stating the long-standing principle that, 'as a general rule, one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel.'") (quoting *United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992)); *SmithKline*

*Beecham Corp. v. Abbott Labs.*, 759 F.3d 990, 992 (9th Cir. 2014) (O'Scannlain, J., dissenting); *Fluck v. Blevins*, 969 F. Supp. 1231, 1236-37 (D. Or. 1997) ("When two Ninth Circuit panel decisions conflict, the trial court ordinarily follows the older case. That is because one Ninth Circuit panel cannot overrule another; only an en banc court can overrule the prior panel decision, at least in the absence of a change in controlling authority.") (citing cases). Second, the inconsistent statement in *Moyo* can be viewed as dictum because it was one of three different reasons the court gave for its ruling. *Moyo*, 32 F.3d at 1385-86. Third, no Ninth Circuit decision has cited *Moyo* for the proposition that mistakes of law can support a retaliation claim, while the Ninth Circuit has reiterated *Learned*'s holding that complained-of conduct must "fairly fall" within Title VII to constitute protected activity for purposes of a retaliation claim. *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 967 (9th Cir. 2009) (Noonan, J., dissenting); *Stucky v. Dep't of Educ.*, 283 Fed. Appx. 503, 505 (9th Cir. 2008); *Sherrill*, 621 Fed. Appx. at 392; *Dorn-Kerri v. Southwest Cancer Care*, 385 Fed. Appx. 643, 644 (9th Cir. 2010).

Applying *Learned*, the Court must grant summary judgment on Maner's retaliation claim. As noted above, the paramour theory does not fairly fall within the protection of Title VII. Federal courts widely hold that workplace favoritism of a romantic partner is not sex-based discrimination under Title VII. Maner therefore did not have an objectively reasonable belief that Defendants' conduct violated Title VII. *See Dorn-Kerri*, 385 Fed. Appx. at 644 ("Summary judgment was proper on the Title VII retaliation claim regarding alleged unlawful billing practices because Title VII does not cover billing practices."); *Sherrill v. Blank*, No. CV-13-00266-TUC-RCC, 2013 WL 11312398, at *2 (D. Ariz. Nov. 26, 2013) ("Title VII's anti-retaliation provision does not make actionable retaliation against an employee that is not engaged in 'protected activity' within the meaning of Title VII."); *Padilla v. Bechtel Const. Co.*, No. CV 06 286 PHX LOA, 2007 WL 1219737, at *6 (D. Ariz. April 25, 2007) ("[N]o retaliation claim exists under Title VII for an employer's refusal to rehire an employee for reporting safety violations to the EEOC. Elimination of safety violations in employment does not 'fairly

fall within the protection of Title VII to sustain a claim of unlawful retaliation.'"); *see also Wilson v. Delta State Univ.*, 143 Fed. Appx. 611, 613 (5th Cir 2005) (applying the "reasonable belief" standard for establishing protected activity and dismissing retaliation claim based on opposition to paramour favoritism).

### C. Motion to Seal.

The parties jointly move to seal portions of Maner's Response to Defendant's Motion for Summary Judgment, Maner's Controverting Statement of Facts, and exhibits in support of Maner's Response to Dignity Health. Doc. 84. Pursuant to the Court's protective order (Doc. 41), Dignity Health has designated as confidential certain deposition testimony and documents concerning a non-party former employee. Doc. 84. Because the documents are attached to a dispositive motion, the parties must show compelling reasons for sealing them. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010).

The identified portions contain sensitive information about the employee, his relationship to Dignity Health, and aspects of Dignity Health's business. Given the harm that could come to this former employee and Dignity Health if the information were revealed, the Court will grant the parties' request to file the identified documents under seal.

**IT IS ORDERED**:

1. Defendant's motion for summary judgment (Doc. 80) is **granted**.
2. The parties' joint motion to file documents under seal (Doc. 84) is **granted**. The Clerk of Court shall accept for filing under seal the document lodged on the Court's docket as Doc. 85.
3. The Clerk of Court shall terminate this matter and enter judgment accordingly.

Dated this 10th day of October, 2018.

David G. Campbell
Senior United States District Judge